## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY A. JARRETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 5778 |
| v. | ) | |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN,[1] | ) | Jeffrey T. Gilbert |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeffrey A. Jarrette ("Claimant" or "Jarrette") brings this action under 42 U.S.C. § 405(g) seeking reversal of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying Jarrette's application for a closed period of disability and disability insurance benefits ("DIB"). This matter is before the Court on Claimant's motion for summary judgment [51]. Claimant argues that the Administrative Law Judge's ("ALJ") decision denying his application should be reversed. Claimant urges the Court to award benefits or, alternatively, to remand the case for further proceedings. In support of his motion to reverse, Claimant raises the following issues: (1) whether the ALJ's step-3 determination concerning whether Claimant's impairment meets

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically substituted as the Defendant in the case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

or medically equals a listed impairment was erroneous; and (2) whether the ALJ's residual functional capacity ("RFC") determination was erroneous.

For the reasons set forth below, Claimant's motion for summary judgment [51] is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

Jarrette was born on July 14, 1963. (R. 103.) He is approximately 6 feet tall and weighs around 180 pounds. (R. 143.) He is right handed. (R. 165.) Jarrette has a twelfth-grade education (R. 17) but completed an "electrical apprenticeship program in 1995 (R. 148). He worked as an electrician for years prior to becoming unemployed. (R. 145.)

Jarrette alleges a disability onset date of January 7, 2007, when he was forty-three years old.[2] (R. 103.) However, he did further work as an electrician for one and a half weeks in April 2007.[3] (R. 74.) Generally, his alleged disability results from pain in his lower back, spine, and legs. (R. 17, 144.)

## A. PROCEDURAL HISTORY

On March 21, 2008 Jarrette filed a claim for DIB, alleging disability since January 7, 2007. (R. 103.) His application was denied on May 2, 2008 (R. 81–83), and upon reconsideration on July 11, 2008 (R. 88–90). On May 29, 2009, Jarrette requested that his application be considered for a closed period of disability,

---

[2] In his brief, Jarrette states that he was forty-four when he became disabled. (Pl. Br. 3.)
[3] The ALJ found this to be an "unsuccessful work attempt." (R. 74.)

commencing January 7, 2007 and ending May 11, 2009, because he had "experienced significant improvement." (R. 102.) Jarrette requested a hearing by an ALJ (R. 93–94), which was held on June 4, 2009 (R. 71). Jarrette personally appeared and testified at the hearing and was represented by counsel. (R. 21, 71.) Medical expert ("ME") Ashok G. Jilhewar, M.D., and vocational expert ("VE") Cheryl R. Hoiseth also testified. (*Id.*)

On July 1, 2009, the ALJ denied Jarrette's claim for a closed period of disability and DIB, finding him not disabled under the Social Security Act. (R. 71–80.) The Social Security Administration Appeals Council then denied Jarrette's request for review (R. 1–3), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## B. RELEVANT HEARING TESTIMONY

### 1. Claimant Jeffrey Jarrette

Jarrette testified that he had been working as an electrician in residential, commercial, and industrial settings. (R. 39–40.) He began experiencing pain on the job and "complain[ed] about it at work." (R. 40.) The pain was in his lower back and became "worse and worse." (*Id.*)

On January 7, 2007, his employer went out of business, and Jarrette stopped working. (R. 40–41.) He has alleged that this was also his disability onset date. (R. 103.) Jarrette attempted to return to work during a ten-day period in April 2007 but experienced pain throughout the work assignment. (R. 36, 41.) He was asked to

return for a subsequent assignment, but he testified that he had not wished to go back. (R. 41.)

Much of Jarrette's testimony concerned his post-work symptoms and activities. In general, Jarrette stated that he had pain that radiated from his right side and lower back through his right buttock and right calf but did not extend into his toes. (R. 41–42.)

Jarrette testified that he endured his "worst incident" in May 2007, when his back "went out." (R. 42–43.) In response to this event, he began seeing an orthopedist, who ordered a magnetic resonance imaging ("MRI"). (R. 43–44.) The MRI detected slight abnormalities in his spine, but the doctor told Jarrette that he was a "healthy man" and that his pain threshold would fluctuate throughout the day because he was taking medication. (R. 44–45.)

Jarrette testified that his condition worsened throughout the remainder of 2007. (R. 45–46.) He did not attempt to work during this period because he had problems sitting in chairs and was unable to become comfortable. (R. 45.) Specifically, he said that he was only able to sit or stand for twenty minutes at any one time and that he was "usually" only able to walk without stopping for 60 feet. (R. 45–46.) In addition, he stated that he was unable to pick up objects from the floor. (R. 46.)

According to Jarrette, his condition further worsened in early 2008. (R. 46–47.) Eventually, he went to the emergency room because medication was not

effectively eliminating his pain. (*Id.*) While in the presence of a Fox Valley physician,[4] Jarrette noticed that his spine was "curved." (R. 47.)

Jarrette testified that, at one point, his doctor gave him muscle relaxers and certain pills, which provided him some pain relief. (R. 48.) Further, a Fox Valley doctor gave him a series of "injections." (R. 49–50.) Although the first injection provided some relief, Jarrette said that he did not recall a second injection being much help. (R. 50.) After a third injection, Dr. Krishna Parameswar[5] "finally" sent him to see a neural surgeon. (*Id.*)

Additionally, Jarrette described some of the daily activities in which he engaged during this period. (R. 48–53.) He said that he lived by himself in a two-story, single-family home. (R. 48–49.) He had difficulty using the stairs and would "crawl up them or crawl down them." (R. 49.) He said that he was only able to do minimal housework (R. 48–49) and that several members of his family would come over to mow his lawn (R. 51–52).

Jarrette also testified that it was difficult for him to drive an automobile and to shop. (R. 49.) Because of an inability to lift his leg, he had trouble getting into and out of his vehicle and needed to pull on his pant leg to do so. (*Id.*) He testified that he shopped at night and leaned on his shopping cart while walking down the aisles. (*Id.*) He also needed approximately thirty minutes to shop. (*Id.*)

---

[4] The hearing transcript indicates that the ALJ repeatedly referred to a "Dr. Fox" when inquiring into Jarrette's treatment history. (R. 45.) No "Dr. Fox" can be found within the relevant medical evidence. It is likely that the ALJ was referring to Dr. Craig Popp, who treated Jarrette at the "Fox Valley Orthopaedic Institute." (R. 245.) Nevertheless, the Court will refer to this individual generically so as to ensure accuracy.

[5] The transcript refers to him as "Dr. Pomerware." (R. 50.)

Moreover, Jarrette testified that he had difficulty sleeping and was only able to sleep for "an hour at the most. "(R. 48.) He was unable to "find a comfortable position" even when using "orthopedic wedges" or attempting different sleeping positions. (*Id.*)

Jarrette testified that it was a challenge for him to use the bathroom. (R. 52–53.) His difficulties were due, in part, to his use of certain pills, which had given him constipation. (*Id.*) As a result, he "didn't eat much" and lost weight. (R. 52.) Moreover, Jarrette would sometimes urinate into a cup when he was unable to walk to the bathroom with sufficient speed. (*Id.*) He would occasionally even spend the night in the bathroom to be close to his toilet. (*Id.*) At the hearing, Jarrette opined that this was the "worst time" of his life. (*Id.*)

Moreover, Jarrette said that he discontinued going to church because he was unable to sit in the seats. (R. 50.) He described one particular instance when he was "writhing in pain" during a church service. (R. 50–51.)

In sum, Jarrette claimed that he was "unpleasant to be around" during this period because he had no energy and was constantly in pain. (R. 51.) He said that his friends and family would comment on his situation and urge him to seek additional help. (R. 53.) Although he did not originally want to undergo an operation, he eventually "was at the end of [his] ropes" and "knew [he] needed something done." (*Id.*)

Jarrette eventually had his back surgery in October 2008 (R. 292), and, by 2009, his condition had seemingly improved. At the hearing, Jarrette testified that

he returned to school and church in January 2009. (R. 38, 51.) During that time, he underwent physical therapy, and he claimed that his physical health had improved over the course of his 2009 class. (R. 39.)

### 2. Medical Expert Ashok Jilhewar

Dr. Ashok Jilhewar testified at the hearing as an ME and said that he was able to provide an assessment of Jarrette's condition on and after March 6, 2008. (R. 24.) However, he said that he was *unable* to assess Jarrette's condition as it was between May 13, 2007 and March 6, 2008 because of a "gap in the management" of Jarrette's symptoms. (*Id.*)

Nevertheless, the ME testified that Jarrette's only impairment was "lower back pain." (*Id.*) The ME opined that the pain would "definitely" result in either impairment or a combination of impairments that would have more than a minimal effect on Jarrette's ability to perform work-related activities. (R. 25.) However, the ME did not feel that Jarrette's impairment met or equaled the criteria of any regulatory "listing." (*Id.*) Further, the ME testified that he had a "problem" with Jarrette's claims of severe pain because, during the relevant period, Jarrette's gate was normal with respect to "heal, toe, tendon, and standing on one leg." (R. 26.) Therefore, Jarrette's ability to ambulate was "normal." (*Id.*)

The ME stated that Jarrette's impairment had necessitated a microdiscectomy, which had "good results." (R. 24.) As of January 22, 2009, Jarrette's pain was "mild" and was not expected to affect his concentration at work. (R. 24–25.)

Nevertheless, the ME opined that Jarrette was unable to work between May 2008 and January 2009, during which time he was, apparently, in "significant pain." (R. 60.) However, the ME concluded that Jarrette did have the RFC for "sedentary" work on either side of that time period. (R. 26–27, 60–61.)

Additionally, the ME stated that Jarrette's symptoms pertained to his right lower extremities. (R. 33–34.) Jarrette had undergone surgery on his right side, and scans had indicated abnormalities on the right side of his spine. (R. 34.) In contrast, an EMG had shown abnormalities on Jarrette's *left* side and a "normal" right side. (*Id.*) When asked by the ALJ, the ME testified that he had no explanation for this seeming contradiction, but he said that the inconsistency was responsible for the hesitation displayed by one of Jarrette's surgeons. (R. 35.)

At one point during the hearing, Jarrette's attorney asked the ME about Jarrette's 2007 MRI. (R. 27–28.) This MRI showed a disc bulge and herniations that contacted Jarrette's right "S1" nerve root. (R. 27.) The ME testified, however, that this type of contact would not necessarily result in pain. (*Id.*) The ME focused on the clinical findings, which apparently did not show that Jarrette had certain types of "narrowing." (R. 27–28.)

Later in the hearing, after Jarrette's own testimony had concluded, the ME said that Jarrette's description of his symptoms was consistent with the medical evidence. (R. 54.) However, the ME also stated that he would not change any of his previous opinions because fewer than twelve months had passed between the time of Jarrette's first injection, May 12, 2008, and the "end" of his surgery, January 22,

2009. (*Id.*) Nevertheless, the ME admitted that Jarrette was not actually released to work until May 2009. (R. 55–56.)

### 3. Vocational Expert Cheryl Hoiseth

Cheryl Hoiseth testified at the hearing as a VE. She stated that, if Jarrette were restricted to "sedentary work," he could not perform his past relevant work. (R. 63.) Further, he would not be able to transfer his prior vocational skills to other sedentary work. (*Id.*) The VE testified that, therefore, the medical vocational grid would direct the outcome of the case. (*Id.*)

The VE added that, if Jarrette were only able to stand for twenty minutes at a time, sit for twenty minutes at a time, and walk for at most 200 feet without stopping, he would be unable to work. (R. 63–64.)

## C. MEDICAL EVIDENCE

### 1. Treating Physicians

#### Craig Popp, M.D.

On May 31, 2007, Jarrette saw Dr. Craig Popp and complained of leg and back pain, weakness, leg numbness, and tingling. (R. 242.) Jarrette reported that the pain had begun in 2006 and that he had not "improved tremendously" since that time. (*Id.*) On a scale of 1 to 10, Jarrette described his pain as ranking a 5. Jarrette also reported that he had no bowel or bladder problems. (*Id.*) After performing a physical examination, Dr. Popp recommended that Jarrette undergo an MRI of his lumbar spine because of the numbness, tingling, and "prolonged period that this ha[d] been going on." (R. 245.)

Subsequently, on June 14, 2007, Jarrette saw Dr. Popp for an evaluation and MRI test results. (R. 238–40.) The physical examination revealed dorsiflexion, plantar flexion, "EHL strong to manual motor test," and, possibly, "slightly decreased right patellar reflex." (R. 238.) The MRI showed a "thrombosed vessel," an extruded disc fragment, or a sequestered disc fragment. (*Id.*) Dr. Popp said that he wanted to see if Jarrette's condition improved over time but recommended "injections" if it worsened. (*Id.*) Dr. Popp ordered physical therapy but noted that Jarrette was "grossly intact" neurologically, aside from some decreased sensation. (*Id.*) Dr. Popp also recommended that Jarrette undergo a lateral recess decompression or microscopic lumbar discectomy if he did not improve. (*Id.*) On July 20, 2007, Jarrette cancelled a previously scheduled appointment because he "forgot." (R. 237.)

Months later, on March 6, 2008, Jarrette went to the Saint Joseph Hospital emergency room, complaining of lower back pain that radiated into his right leg. (R. 210–19.) He claimed that he was unable to straighten his leg due to the pain and that he was experiencing numbness from his right knee to his right foot. (R. 213.) Jarrette was given the medication Dilaudid and later reported that some of the pain had subsided. (R. 214.) He was discharged the same day with a prescription for Dilaudid. (*Id.*)

Also on March 6 2008, Jarrette underwent several diagnostic images of his spine. (R. 220.) The procedure revealed no fracture or subluxation, but it was a "limited study." (*Id.*) Further, the report indicated that Jarrette was "unable to

cooperate with optimal positioning" during the procedure. (*Id.*) A subsequent procedure dated March 11, 2008 revealed "[m]ultilevel degenerative findings and disc bulges with right paracentral disc protrusion L5-S1 and L4-L5 disc protrusion extending into the right neural foramina." (R. 223.) The procedure also showed "[s]mall signal abnormality within the L1 vertebral body" that demonstrated "no abnormal enhancement." (R. 224.) In addition, the report indicated that there was "[n]o evidence of disc extrusion or high grade central canal stenosis." (R. 223.)

On March 12, 2008, Dr. Popp opined that Jarrette was "neurologically intact" but had a small disc herniation in his right side that was causing him pain and discomfort. (R. 235.) On March 21, 2008, Dr. Popp noted that Jarrette had a "positive straight leg raise on the right side." (R. 234.) A physical examination revealed dorsiflexion, plantar flexion, EHL strong to manual motor testing, and slightly decreased reflexes in the right Achilles. (*Id.*) Dr. Popp analyzed one of Jarrette's MRIs, noting that it revealed only a "relatively small" disc herniation. (*Id.*) But Dr. Popp also opined that Jarrette's pain responses were consistent with a "significant neurologic impingement." (*Id.*) Dr. Popp said that Jarrette should undergo both an MRI of his pelvis and an EMG nerve conduction test and that they would, subsequently, "proceed from there." (*Id.*)

On April 4, 2008, Dr. Popp opined that Jarrette's pain was "out of proportion" to what he would expect given the MRIs and other findings. (R. 259.) He noted that Jarrette still needed to undergo an MRI of his pelvis. (*Id.*) Lastly he said that he

was only able to "authorize his disability" for the time period during which he had been seeing Jarrette. (*Id.*)

The MRI of Jarrette's pelvis finally occurred on April 24, 2008. (R. 260.) It found that Jarrette's pelvis was, for the most part, normal and unremarkable. (*Id.*) The findings did indicate, however, some "increased signal" within his right groin, as well as "L5-S1 broad-based central right paracentral disk herniation" that "appears to contact . . . [a nerve] without any significant displacement." (*Id.*) The MRI also showed some increased signal intensity in Jarrette's left femur that appeared "benign." (*Id.*)

Subsequently, at an April 30, 2008 appointment, Dr. Popp opined that Jarrette had S1 radiculopathy and that it was "worth trying an injection." (R. 261.) Dr. Popp added that he might consider performing a microdiscectomy if the injection proved to be unsuccessful. (*Id.*)

### Krishna Parameswar, M.D.

In May 2008, Dr. Popp referred Jarrette to Dr. Krishna Parameswar, who also recommended an injection. (R. 265–66.) On May 12, Jarrette underwent a transforaminal epidural steroid injection, which decreased his pain to a "2 to 3 out of 10." (R. 262–63.) However, pain and numbness remained, and Dr. Michael Hammer[6] recommended a second injection, which ultimately occurred on June 2. (R. 262, 272.)

At a June 19, 2008 appointment, Jarrette stated that his pain had only been reduced twenty percent and ranked a "3 to 4 out of 10 on the Visual Analog Scale."

---

[6] Dr. Hammer was also referred by Dr. Popp. (R. 263.)

(R. 270.) The office visit report indicated that the two steroid injections had "not given him significant functional improvement." (*Id.*) Dr. Parameswar nevertheless recommended that Jarrette undergo a third injection, try physical therapy, and increase his usage of Vicodin. (R. 271.)

Jarrette's third and final steroid injection occurred on August 7, 2008. (R. 309.) When he saw Dr. Parameswar several weeks later, he did not have "any improvement of his pain symptoms," which now ranked a "5 out of 10 on the Visual Analog Scale." (R. 310.) Dr. Parameswar stated that Jarrette was lying on the examination table in "severe pain" and was "unable to sit up without discomfort." (*Id.*) The doctor said that Jarrette was "looking for a possible surgical option to improve his pain." (*Id.*)

### Daniel Laich, D.O.

Jarrette began seeing Dr. Daniel Laich in September 2008. (R. 201.) Dr. Laich performed back surgery on October 22, 2008 and later noted that "the findings [were] consistent with intervertebral disc herniation." (R. 292.)

By November 6, 2008, Jarrette's condition had "significantly improved." (R. 321.) Nevertheless, Dr. Laich did "not encourage him" to return to work at that time. (*Id.*) While still under Dr. Laich's care, Jarrette began physical therapy at Occu-Sport Physical Therapy. (R. 311–20.) On December 11, 2008, Jarrette told Dr. Laich that he felt even more improvement, but Laich still recommended that he not return to work. (R. 322.)

Jarrette continued to recover in the weeks leading up to a January 22, 2009 office visit. (R. 323.) On that day, Dr. Laich opined that he would allow Jarrette to return to work "should he obtain a union job with light duty." (*Id.*)

At a physical therapy evaluation dated February 24, 2009, Jarrette reported "minimal to no pain in [his] lumbar region," but also noted some "significant tightness throughout [his] lumbar and pelvic region." (R. 318.) By this point, he had resumed participation in sporting activities. (*Id.*) He was discharged from physical therapy on March 20, 2009, having "met all stated goals." (R. 319.) Finally, on May 11, Dr. Laich released Jarrette to return to work. (R. 326.)

### 2. Disability Determination Services ("DDS") Consultants

### Charles Kenney, M.D.

On April 17, 2008, Dr. Charles Kenney completed a consultative RFC assessment (R. 246–53) and found that Jarrette could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk for a total of at least two hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday (R. 247). Further, Jarrette had an "unlimited" ability to push/pull. (*Id.*) Dr. Kenney noted that Jarrette's pain responses were "consistent with neurologic impingement" and that his range of motion was "slightly limited due to pain." (*Id.*)

As for postural limitations, Dr. Kenney opined that Jarrette could frequently climb ramps and stairs but could never climb ladders, ropes, or scaffolds. (R. 248.) Further, Jarrette could only occasionally stoop, kneel, crouch, or crawl. (*Id.*) Dr.

Kenney found no manipulative, visual, communicative, or environmental limitations. (R. 249–50.)

To conclude, Dr. Kenney stated that Jarrette's "description of his symptom of pain [was] credible and supported by the medical and other evidence of record." (R. 253.)

### David Bitzer, M.D.

On June 10, 2008, Dr. David Bitzer affirmed Dr. Kenney's "limited light" RFC assessment. (R. 281–83.) To Dr. Bitzer, the medical records indicated that Jarrette had "x-ray evidence of lumbar disc herniation with evidence of radiculopathy. (R. 283.) In addition, Dr. Bitzer opined that Jarrette's allegations were "considered credible." (*Id.*)

## D.  ALJ DECISION

After a hearing and a review of the medical evidence, the ALJ found that Jarrette was not disabled under the Social Security Act. (R. 79.) The ALJ reviewed Jarrette's application under the required five-step evaluation process. (R. 72–73.) As an initial matter, the ALJ found that Jarrette met the disability insured status requirements. (R. 73.) Then, at step 1, the ALJ found that Jarrette had not engaged in substantial gainful activity at any time material to the decision.[7] (*Id.*) At step 2, the ALJ found that Jarrette had "at least one" medically determinable severe impairment, or its equivalent. (R. 74.) The ALJ credited Jarrette's hearing

---

[7] The ALJ concluded that Jarrette's return to temporary work in April 2007 was an "unsuccessful work attempt." (R. 74.)

testimony that Jarrette's "musculoskeletal system impairments" were severe as of March 2007. (*Id.*)

Subsequently, at step 3, the ALJ found that Jarrette's impairments, alone or in combination, did not meet or equal the criteria of any of the regulatory listings. (*Id.*) In support of this finding, the ALJ noted that "all of the medical opinions of record on this issue are in accord." (*Id.*) The ALJ acknowledged that the listing most consistent with Jarrette's condition was 1.04A. The ALJ then cited the hearing testimony of the ME, who had explained that Jarrette did not experience motor or sensory deficits and that there were documented, "normal patellar examination findings." (*Id.*) As for the listing found at 1.00B(2)(b), the ALJ credited the ME's testimony that Jarrette's gait had been normal and that Jarrette demonstrated the ability to "tandem, as well as heel and toe, walk, and . . . stand on one lower extremity." (R. 75.)

For step 4, the ALJ found that Jarrette had the RFC to perform a range of unskilled, sedentary work. (*Id.*) The ALJ stated that the "exertional demands of sedentary work" were specified in the regulations and that the limitations were consistent with the opinions of the DDS consultants. (*Id.*)

In formulating this RFC, the ALJ relied upon the testimony of the ME. In general, the ALJ found "the opinions of the medical expert to be the most informed, consistent with the medical evidence, convincing, and consistent with the record as a whole." (R. 77.) Particularly, the ALJ referenced the ME's assertions that "contact

of an anatomical structure with a nerve root may, or may not, result in pain" and that "even imagings of frank abnormalities might not result in pain." (R. 75.)

The ALJ found that, aside from a "discreet [*sic*] period of incapacity from May 12, 2008 until January 22, 2009," the ME agreed with the DDS consultants. (*Id.*) The ME had explained that there was no inconsistency between Jarrette's positive surgical results noted in January 2009 and his continued participation in physical therapy until March 13, 2009. (*Id.*) The ALJ added that the ME's testimony was, itself, consistent with Jarrette's testimony that the he enrolled in a college class in January 2009. (*Id.*)

The ALJ emphasized that the ME's assessment of Jarrette's symptoms had been determined by the "intensity of pain management documented in the medical evidence." (*Id.*) The ME had stated that there was neither documentation of significant, ongoing, medical treatment for medically severe pain prior to May 2008 nor documentation of the clinical effects of medically severe pain. (R. 75–76.)

Nevertheless, the ALJ then proceeded to describe Jarrette's worsening condition in 2007 and 2008. (R. 76.) The ALJ stated that "[i]nterestingly, in a statement in April 2008, the claimant's treating specialist opined that the claimant had been unable to work since May 2007." (*Id.*) Further, the ALJ referenced Jarrette's testimony that he had received three injections in 2008, each with diminishing effectiveness. (*Id.*) However, according to the ALJ, the ME considered that testimony to be "both consistent and inconsistent with the medical evidence concerning the injections." (*Id.*)

In addition, the ALJ found that the ME's testimony was consistent with Jarrette's claims that his symptoms had worsened over time. (*Id.*) The ALJ discussed several of Jarrette's daily physical difficulties, including his inability to sit in a chair or stand for more than twenty minutes at a time and the allegation that he could only walk between 50 and 200 feet at a time before experiencing pain. (R. 76–77.) The ALJ also mentioned that Jarrette had undergone successful surgery. (R. 77.)

In sum, according to the ALJ, the ME concurred with Jarrette's description of his symptoms and limitations as they were between May 2008 and January 2009. (*Id.*) However, the ALJ then stated that he did "not credit the claimant's implicit allegation that he experienced this degree of unremitting, intense pain before May 2008." (*Id.*) Nonetheless, the ALJ did "credit his allegation that he experienced discreet [*sic*] episodes of intense pain" in 2007 and 2008. (*Id.*)

The ALJ then described the medical evidence concerning Jarrette's various treating physician's, including Dr. Popp and Dr. Laich. (R. 77–78.) In particular, the ALJ noted Jarrette's March 7, 2008 examination by Dr. Popp. (R. 77.) On that date, Popp had opined that Jarrette's complaints of pain were out of proportion to what would be expected from the objective evidence. (*Id.*)

To conclude his step-4 analysis, the ALJ found that Jarrette was unable to perform any past relevant work. (R. 78.)

Finally, at step 5, the ALJ found that Jarrette's acquired vocational skills were not transferable to other occupations within the previously established RFC.

(R. 79.) Further, based upon Jarrette' age, education, work experience, and RFC, the ALJ determined that there were jobs existing in significant numbers in the national economy to which Jarrette could adapt and that he could perform. (*Id.*) According to the ALJ, "the record establishe[d] that the claimant was not prevented from performing other work for any continuous period of at least 12 months during the period at issue." (*Id.*) As a result, the ALJ concluded that Jarrette was not disabled under the Social Security Act during any time material to the decision. (*Id.*)

## II. LEGAL STANDARD

### A.     STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the District Court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d

589, 593 (7th Cir. 1992). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). If the ALJ's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). At the same time, an ALJ may not "select and discuss only that evidence that

favors his ultimate conclusion" but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. DISABILITY STANDARD

DIB is available to a claimant who can establish that he has a "disability" as defined under the Social Security Act.[8] 42 U.S.C. § 423. Under the Act, the term "disability" refers to an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d).

In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 404.1520.

---

[8] The standard for determining "disability" for DIB is "virtually identical" to that used for supplemental security income benefits ("SSI"). *Hankerson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980); *see Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."); *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007); *Knipe v. Heckler*, 755 F.2d 141, 145 n.8 (10th Cir. 1985). Accordingly, this Court cites to both SSI and DIB cases.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## III. DISCUSSION

Jarrette argues that the ALJ's decision should be reversed or remanded because (1) the ALJ's step-3 determination concerning whether Claimant's impairment meets or medically equals a listed impairment was erroneous; and (2) the ALJ's RFC determination was erroneous.[9] Jarrette urges that, should the case be remanded, it be remanded with a request that the Commissioner assign a new ALJ.

## A.    THE ALJ'S STEP-3 DETERMINATION WAS ERRONEOUS

Jarrette first argues that the ALJ's step-3 determination was erroneous. At step 3 in the sequential evaluation process, an ALJ must determine whether a claimant's impairment meets or medically equals one of the impairments found within the regulatory listings. 20 C.F.R. § 404.1520(a)(4)(iii), 20 C.F.R. Pt. 404, Subpt. P, App. 1. If so—and if the impairment has lasted or is expected to last for a continuous period of at least twelve months—the claimant is presumed to be

---

[9] Jarrette also argues that the ALJ's credibility determination was patently wrong. We address Claimant's credibility and RFC arguments together.

"disabled." *See Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); 20 C.F.R. §

404.1520(a); *see also* 20 C.F.R. § 404.1509 ("We call this [twelve-month condition]

the duration requirement.").

A claimant "has the burden of showing that his impairments meet a listing"

and "must show that his impairments satisfy all of the various criteria specified in

the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Nevertheless,

when the ALJ fails to mention the specific listing she is considering and only

provides "perfunctory analysis," remand may be required. *See id.* at 583 (quoting

*Barnett*, 381 F.3d at 668); *see also Rice v. Barnhart*, 384 F.3d 363, 369–70 (7th Cir.

2004) ("We have recently held that where an ALJ omits reference to the applicable

listing and provides nothing more than a superficial analysis, reversal and remand

is required.").

In this case, although the ALJ did cite to several relevant listings, his step-3

analysis was so inadequate and cursory as to require remand. Simply put, he did

not build the necessary "logical bridge" between the evidence and his conclusion. *See*

*Berger*, 516 F.3d at 544. To illustrate, the ALJ's brief step-3 analysis consisted of

the following sentences:

> Either implicitly or explicitly, all of the medical opinions of record on
> this issue are in accord.

> The medical expert noted that the provisions that come closest to the
> nature of the claimant's impairments are included within § 1.04A of
> the Listing of Impairments. He explained that, throughout the record,
> the claimant has not experienced either motor or sensory deficits due
> to those impairments, except for a slight decrease in an ankle reflex
> noted on clinical examination on March 21, 2008. He explained that

> normal patellar examination findings were documented when the claimant's treating physician suspected a possible abnormality.
>
> With respect to the requirements under § 1.00B(2)(b) of the Listing of Impairments, he noted that the claimant's gait had been normal and that, on clinical examination, the claimant had demonstrated the ability to tandem, as well as heel and toe, walk, and could stand on one lower extremity.

(R. 74–75 (internal citations omitted).) Thus, in effect, the ALJ's step-3 analysis consisted of a one-sentence statement that the medical records were in agreement, followed by a recitation of ME testimony.

As an initial matter, the ALJ's step-3 analysis was hampered by his use of ambiguous wording. The first sentence is confusing and, ultimately, unsubstantiated. (R. 74.) The ALJ did not actually identify the "issue" on which all of the medical records were seemingly "in accord." (*Id.*) We do not know whether the "issue" in question involved Jarrette's satisfaction of *any* listing, of a particular listing, or of certain criteria within a particular listing.

Similarly, the ALJ did not explain the ways in which the medical records were "implicitly or explicitly" in accord. (*Id.*) To be sure, his suggestion that certain records were in accord could have led to cogent and decisive analysis, but the ALJ failed to elaborate on the idea.

In fact, within the step-3 finding, the ALJ himself never actually analyzed "the medical opinions of record." (R. 74–75.) Instead, the ALJ simply summarized portions of the ME's testimony without ever directly stating that he intended to credit the ME. While the ALJ did cite to two pieces of independent medical evidence (R. 234, 238), it was merely in the context of reciting the ME's testimony. (R. 74.)

Thus, the particular evidence only formed part of the analysis by virtue of having been previously addressed by the ME.

But even putting aside the ALJ's inappropriate reliance on the ME's testimony, the step-3 finding was seriously flawed. The ALJ/ME suggested that the listing most applicable to Jarrette was listing 1.04A. (*Id.*) Listing 1.04A states, in relevant part:

> 1.04 Disorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 (paragraphs "B" and "C" omitted).

However, the portions of the ME's testimony that made up the ALJ's step-3 discussion did not address all of the criteria of listing 1.04A. Specifically, the portions of testimony cited by the ALJ only indicated that (1) Jarrette had documented normal patellar findings; and (2) Jarrette had no motor or sensory deficits, aside from a slight decrease in his ankle reflex. (R. 74–75.) In his brief, Jarrette argues that he did satisfy the criteria of listing 1.04A and, in support, cites numerous pieces of medical evidence. (Pl. Br. 8.) While we do not hold that the ALJ should have been persuaded by this other evidence, the ALJ's failure to mention any of this evidence in his step-3 discussion is troubling—particularly because an analysis of this evidence seemingly was disregarded in favor of a mere recitation of

ME testimony. "Although the ALJ [was] not required to mention every piece of evidence in the record," the failure to evaluate evidence that potentially supported Jarrette's claim suggests that the ALJ did not "adequately consider[]" Jarrette's case. *See Ribaudo*, 458 F.3d at 584.

Further clouding the step-3 analysis, the ALJ proceeded to summarize ME testimony concerning Jarrette's ability to walk. (R. 75.) While a claimant's ability to "ambulate effectively" is a relevant issue for listing 1.04 "C"—and is defined by listing 1.00B(2)(b)—effective ambulation has no bearing on whether a claimant satisfies listing 1.04 "A," the very listing reviewed by the ALJ/ME in the preceding paragraph. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Nor did the ALJ provide any discussion as to whether Jarrette satisfied the *other* criteria of listing 1.04C. Therefore, we are not comfortable concluding that the ALJ applied the correct standards at step 3. On remand, the ALJ should provide a more thorough analysis of the particular listing or listings that Jarrette either satisfied or failed to satisfy.

In addition, none of the Commissioner's arguments persuades us that the ALJ's step-3 finding ought to stand. On the contrary, each evinces flaws of its own. First, the Commissioner states that, even if Jarrette satisfied the *medical* requirements of listing 1.04A, Jarrette should not be presumed disabled at step 3 because he did not show that he met the twelve-month duration requirement. But critically, the ALJ never analyzed the duration requirement at step 3, and the question of whether Jarrette satisfied the requirement did not form any part of the ALJ's step-3 analysis. (R. 74–75.) As a result, the Commissioner's argument violates

the so-called *Chenery* doctrine, "which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). While the ALJ did elsewhere broach the issue of whether Jarrette's symptoms persisted for twelve months (R. 75, 77, 79), that particular point appears to have played no role in his step-3 finding (R. 74–75).

Further, the Commissioner contends that the "ALJ appropriately acknowledged [that] the state agency reviewing physicians agreed that Plaintiff's impairment did not meet or equal the criteria of a listed impairment." (Def. Br. 4–5.) The ALJ neither discussed nor cited the DDS doctors at step 3.[10] (R. 74–75.)

Remand, rather than reversal, is warranted in this case because the record cannot "yield but one supportable conclusion." *See Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). Although we cannot conclude that Jarrette met or equaled listing 1.04A or any other listing, the ALJ's step-3 discussion was so inadequate as to prevent meaningful review by this Court. The ALJ will be able to resolve several of the above issues by providing a thorough analysis of the relevant step-3 evidence on remand. Specifically, the ALJ should identify a particular listing or listings and provide more than perfunctory analysis as to whether Jarrette met or equaled[11]

---

[10] Further, the Commissioner's argument is somewhat forced with respect to its characterization of the DDS doctors' opinions. In the physical RFC completed by Dr. Kenney, the doctor never directly addressed the applicability of any particular listing. (R. 246–53.) For his part, Dr. Bitzer merely affirmed Dr. Kenney, although he did refrain from putting a check mark in several boxes that would have indicated that Jarrette met or equaled a listing. (R. 281–83.)

[11] Because both parties comment on whether Jarrette medically "equaled" a listing—as opposed to meeting it—we urge the ALJ to provide a more thorough analysis of medical equivalence as well.

that listing. In addition, the ALJ should address the twelve-month duration requirement in his step-3 analysis.

## B.    THE ALJ'S RFC DETERMINATION WAS ERRONEOUS

Jarrette also criticizes several aspects of the ALJ's RFC assessment. Although remand is already warranted in this matter due to the ALJ's inadequate step-3 determination, we nevertheless point out several issues with the RFC analysis so that they may be avoided or addressed on remand.

RFC describes the "work-related activities [that] the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); SSR 96-8p[12] ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). Further, an RFC assessment is a "function-by-function assessment." SSR 96-8p.

In assessing RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . ." *See id.* The ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform . . . ." *Id.* Moreover, the ALJ must "explain how

---

[12] Social Security Rulings ("SSR") do not have force of law, but they are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In the instant case, Jarrette argues that the ALJ violated SSR 96-8p by neither performing a functional analysis nor providing the requisite narrative discussion. (Pl. Br. 9, 10.)

As a preliminary matter, SSR 96-8p does not require an ALJ to "articulate a claimant's RFC on a function-by-function basis."[13] *Amey v. Astrue*, No. 09-C-2712, 2012 WL 366522, at *12 (N.D. Ill. Feb. 2, 2012) ("Although an ALJ is required to consider [a claimant's physical and mental ability to carry out work], remand is not required merely because an ALJ fails to state his findings in the item-by-item manner Plaintiff claims."); *see Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009). Rather, the ALJ is required to *consider*—but not to articulate—the RFC on a function-by-function basis. *Knox v. Astrue*, 572 F. Supp. 2d 926, 939 (N.D. Ill. 2008) (citing *Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007)), *aff'd*, 327 F. App'x 652 (7th Cir. 2009). An ALJ satisfies the "discussion requirements by analyzing the objective medical evidence, [the claimant's testimony and credibility] . . . and other evidence." *Knox*, 327 F. App'x at 657–58.

In this case, the ALJ found Jarrette to have been "incapacitated" between May 2008 and January 2009 (R. 75, 77), and the ME testified that Jarrette was unable to work during the same period (R. 60). However, because this period of incapacity lasted fewer than twelve months, Jarrette's ultimate case turns on the

---

[13] In his brief, Jarrette contends that an ALJ "must undertake a function-by-function assessment" of his work-related abilities. (Pl. Br. 9.)

validity of the ALJ's conclusion that he *was able* to perform sedentary work before May 2008 or after January 2009.

The RFC determination was flawed because the ALJ failed to build an accurate and logical bridge between the relevant evidence and his conclusion. From his decision, we do not clearly understand how or why the ALJ, on the one hand, credited Jarrette's allegations of incapacity between May 2008 and January 2009 but, on the other, dismissed his allegations of having equivalent pain prior to May 2008. The ALJ recited a great deal of evidence in the course of assessing Jarrette's RFC, but he provided sparse illuminating analysis or rationale. Often, the ALJ would cite or describe evidence but not explain its relevance to the RFC assessment. This practice was so rampant that it has hindered meaningful review. On remand, the ALJ should provide a more comprehensive analysis of Jarrette's RFC so that his rationale can be understood by a subsequent reviewer.

We note several specific flaws in the RFC analysis in the interest of preventing their recurrence on remand. For instance, at one point during the ME's testimony, the ME stated *both* (1) that Jarrette did not have documented, significant, ongoing, medical treatment for medically severe pain before May 2008; and (2) that he had been prescribed a "Medrol Dosepak" in March 2008. (R. 75, 235.) The ALJ simply cited this testimony without reconciling the possible inconsistency between the two assertions.

Moreover, Jarrette argues that the ALJ ignored the so-called "treating physician rule," under which an ALJ must give controlling weight to a treating

physician's opinion if the opinion is both (1) "well-supported"; and (2) "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527; *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The ALJ must also "offer good reasons for discounting" the opinion of a treating physician. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted); *Scott*, 647 F.3d at 739.

In this case, it is unclear what weight the ALJ gave to Jarrette's treating physicians. The ALJ did cite to Dr. Popp's April 4, 2008 report, wherein the doctor noted: "I think that [Jarrette's] pain is out of proportion to what I would expect with all the findings here." (R. 77, 259.) But the ALJ did not adequately address additional pieces of evidence that could have clarified Dr. Popp's opinion about the legitimacy of Jarrette's pain. For example, on the same day Dr. Popp completed the cited report, he elsewhere noted that Jarrette was unable to work "since" May 2007. (R. 268.) The ALJ found this statement to be "interesting[]" but did not actually elaborate as to why. (R. 76.) Accordingly, it is unclear how the ALJ viewed the evidence or even whether it was truly considered at all.

The Commissioner is correct to note that "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *see* 20 C.F.R. § 404.1527(d) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will

determine that you are disabled."). Nevertheless, "the ALJ must consider the opinion and should recontact the doctor for clarification if necessary." *Barnett*, 381 F.3d at 669.

Moreover, Dr. Popp—at some point *after* making the April 4, 2008 report that apparently cast doubt on Jarrette's allegations—nonetheless referred Jarrette to a pain management specialist. (R. 77, 265.) Such a referral at least hints at the possibility that Dr. Popp's opinions were not as unambiguous as the ALJ implied. Accordingly, the ALJ should have further explored this inconsistency in the decision.

Jarrette also argues that the ALJ failed to properly evaluate his credibility. When a claimant alleges subjective symptoms, an ALJ evaluates the credibility of those allegations. SSR 96-7p. An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

An ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003) (quoting *Zurawski v. Halter*, 245 F.3d 881, 887–88 (7th Cir. 2001)).

In addition, when assessing the credibility of an individual's statements about symptoms, an ALJ must consider the evidence in light of the entire case record. *See* SSR 96-7p. "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." *Id.* The ALJ must consider the "individual's daily activities" and the "location, duration, frequency, and intensity of the individual's . . . symptoms." *Id.* Similarly, where the individual attends a hearing conducted by an ALJ, the ALJ may also consider his own observations of the individual. *Id.*

In this case, the ALJ paraphrased in some detail Jarrette's testimony that he was in a great deal of pain prior to May 2008. (R. 76–77.) However, the ALJ explained neither the weight of this testimony nor why it was largely rejected in favor of the ME's testimony. (R. 76.) Similarly, when the ALJ described the grim state of Jarrette's daily activities, he never directly reconciled these facts with his RFC conclusion. (*Id.*)

Jarrette put forth—and the ALJ summarized—testimony regarding Jarrette's symptoms of pain dating back to as early as 2007. (R. 76–77.) Jarrette stated that his first significant experience of pain occurred in March 2007 and that his back "went out" in May 2007. (R. 76.) As to the latter event, the ALJ stated that Jarrette "experienced the most intense pain that he ha[d] ever experienced" and that he went to an orthopedist as a result. (*Id.*) Further, the ALJ seemed to credit

Jarrette's allegation that medication caused him to become so constipated that he occasionally slept on the floor of his bathroom. (R. 76–77.)

Yet, in response to this evidence, the ALJ simply stated that he believed that Jarrette "experienced discreet [*sic*] episodes of intense pain" during 2007 and 2008. (R. 77.) On the other hand, he did "not credit the claimant's implicit allegation" that he experienced, before May 2008, symptoms and functional limitations as intense as those existing after May 2008. (*Id.*) As a basis for discrediting Jarrette, this explanation is not sufficiently specific to make clear the weight the ALJ gave to Jarrette's testimony and his reasons for doing so. *See Lopez*, 336 F.3d at 539–40 (citing *Zurawski*, 245 F.3d at 887–88). Moreover, the ALJ apparently drew negative "inferences about [Jarrette's] symptoms and their functional effects," SSR 96-7p, from his failure to attain certain medical treatments prior to May 2008 (R. 75). However, an ALJ cannot do so without first considering a claimant's reasons for failing to attain treatment. *See* SSR 96-7p.

In addition, the ALJ concluded that "no restriction of activities was placed on" Jarrette after his March 6, 2008 trip to the emergency room, where he had complained of lower back pain. (R. 77, 210–19.) However, the ALJ did not adequately address either the fact that Jarrette saw Dr. Popp the very next day with complaints of pain (R. 236) or that, several days later, Dr. Popp recommended that Jarrette use a "Medrol Dosepak" (R. 77, 235).

Finally, Jarrette contends that the ALJ failed to consider his impairments in combination. *See Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) ("When

determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment."). While the ALJ should, on remand, more clearly label and articulate Jarrette's impairment or impairments,[14] we briefly note that it is the *claimant* who bears the burden of producing medical records that would show a given impairment. *See Denton*, 596 F.3d at 424.

## C. THE COURT WILL NOT REQUEST THAT THE COMMISSIONER ASSIGN THE CASE TO A DIFFERENT ALJ

In closing, Jarrette asks the Court to remand the case with a request that the Commissioner assign a new ALJ. However, he provides no justification for why the Court should take this action.

For due process reasons, a court may require a change in ALJ if the ALJ has "demonstrated a degree of bias." *See United States v. Thouvenot, Wade & Moerschen, Inc.*, 596 F.3d 378, 386 (7th Cir. 2010). Alternatively, courts within the Seventh Circuit have, from time to time, "recommended" that a case be transferred to a new ALJ. *E.g.*, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996); *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000).

We will do neither. Jarrette has not alleged any bias on the part of the ALJ, nor is bias apparent from the record. Further, at no point did the "tone" of the ALJ's opinion suggest that he has "an unshakeable commitment to the denial" of Jarrette's claim. *Sarchet*, 78 F.3d at 309. On the contrary, the record indicates that

---

[14] For example, at step 2, the ALJ merely found that Jarrette had "at least one, medically determinable, 'severe' impairment, or its equivalent." (R. 74.) The ALJ referenced Jarrette's pain and "musculoskeletal system impairments," but it is unclear what specific impairments the ALJ actually considered severe. (*Id.*)

the ALJ treated Jarrette with a great degree of respect. For instance, Jarrette arrived late to the hearing due to traffic en route. (R. 22, 28.) The ALJ told Jarrette—who, apparently, was visibly flustered—that he could "relax" and that he did not need to apologize. (R. 28, 35.) Moreover, the ALJ seemingly went out of his way to state in the opinion that Jarrette was a "sympathetic individual." (R. 79.) While the ALJ's decision is being overturned for the reasons discussed above, the question of whether or not to transfer this case to a new ALJ is one best answered by the Commissioner.

## IV. CONCLUSION

For the reasons set forth above, the Court grants Claimant's motion for summary judgment [51], reverses the decision of the Commissioner, and remands this case for further proceedings consistent with this opinion.

It is so ordered.

ENTERED:

DATE: April 18, 2014

_____

JEFFREY T. GILBERT
United States Magistrate Judge